FILED

2013 Sep-18  AM 08:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **VINCENT EDWARD COBB,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-11-CLS-** |
| | ) | **4132-NE** |
| **FLORENCE CITY BOARD OF** | ) | |
| **EDUCATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Vincent Edward Cobb, brought this action on December 8, 2011, asserting claims against his former employer, the Florence City Board of Education, for: (1) sex discrimination, race discrimination, and retaliation pursuant to the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); (2) sex discrimination, race discrimination, and retaliation pursuant to 42 U.S.C. § 1981 and the Fourteenth Amendment to the United States Constitution; (3) disability discrimination pursuant to the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (the "ADA"); (4) retaliation pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* (the "FMLA"); and (5) age discrimination pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et*

*seq.* (the "ADEA").[1]  The court later dismissed the ADEA, sex discrimination, and race discrimination claims upon plaintiff's motion.[2]  Thus, the only remaining claims are: (1) the ADA claim; (2) the FMLA claim; (3) the retaliation claim under Title VII; and (4) the retaliation claim under 42 U.S.C. §§ 1981 and 1983.  Defendant has moved for summary judgment on all of those claims.[3]  Upon consideration of the motion for summary judgment, the briefs, and the evidentiary submissions, the court concludes the motion should be granted, and summary judgment should be entered in defendant's favor on all of plaintiff's claims.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable

---

[1] *See* doc. no. 1 (Complaint).

[2] *See* doc. no. 19 (Order Dismissing Fewer Than All Claims).

[3] Doc. no. 20.

inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied).  *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

### A.    Plaintiff's Educational Background and Non-Board Employment History

Plaintiff, Vincent Edward Cobb, received a Bachelor of Science degree in Physical Education from the University of North Alabama in 1990 or 1991.  He did

not attend graduate school or receive a teaching certification from the Alabama State Department of Education.[4]  Instead, from 1987 to 2004, plaintiff worked for the United Parcel Service ("UPS") in various positions, including unloader, preloader, and driver.  Sometimes his job duties for UPS required him to clean a building.[5]  Plaintiff also served in the United States Naval Reserves from 1986 to 1994, performing clerical work and radio communications duties.[6]  From 1992 to 1993, plaintiff worked for the City of Russellville, Alabama, Park and Recreation Department as the Director of the "Chuckie Mullins Center."  There, he conducted recreational and extra-curricular programs for at-risk youth in the community.[7]  In 2007, plaintiff started a private lawn care business, providing services such as cutting grass, weed eating, trimming shrubs, applying mulch, maintaining flower beds, pulling weeds, and removing debris.[8]

## B.    Plaintiff's Employment With the Board

Plaintiff first became employed by the Florence City Board of Education ("the Board") during the summer of 2004 as a Special Needs Teaching Assistant at Burrell-Slater Community Education Center, where the Board was conducting a summer

---

[4] Defendant's evidentiary submission, Exhibit A (Deposition of Vincent Edward Cobb), at 19.

[5] *Id.* at 23-25.

[6] *Id.* at 21-22; *see also* Cobb Deposition, at Exhibit 1 (Resume of Vincent E. Cobb).

[7] Cobb Deposition, at 25-26; *see also* Cobb Resume.

[8] Cobb Deposition, at 27-28.

program for special needs students.  In that position, plaintiff's primary duty was to make sure the students had enough activities to keep them busy.  He played games with the students, took them outside to play, and assisted them with arts and crafts projects.[9]

From the beginning of the 2004-2005 school year to January of 2005, plaintiff transferred to Florence High School to assist a teacher with a special needs student who had suffered a brain injury and sometimes exhibited behavioral problems.  The student was a large male who had injured a teacher in the past, so the Board wanted to hire an adult male aide to work with the student.  Plaintiff's task was to keep the student calm while the teacher presented classroom lessons in math, reading, and other basic academic subjects.[10]

Between January and July of 2005, plaintiff worked at Weeden Elementary School.  One of his tasks was to assist four different kindergarten teachers with reading instruction as part of the Alabama Reding Initiative program.[11]  He worked one-on-one with students who were struggling with reading, as directed by the classroom teacher.[12]  Plaintiff also worked with third- and fourth-grade special

---

[9] *Id.* at 50-53.

[10] *Id.* at 53-56.

[11] *Id.* at 56-57, 63-66.

[12] *Id.* at 63-65.

education students at Weeden, again assisting those students with subjects in which they were struggling, as directed by the classroom teacher.[13]

At the beginning of the 2005-2006 school year, plaintiff began working as a Campus Security Officer at the Florence Middle School/Freshman Center ("Freshman Center"), a new school that housed seventh- through ninth-graders who had formerly attended two rival schools.  The Freshman Center already had a School Resource Officer, who was a uniformed officer of the Florence Police Department assigned solely to the school.  Even so, the Board hired a Campus Security Officer at the Freshman Center, as well as at the newly consolidated High School, to provide extra security because fights were expected as a result of combining the two rival schools. As Campus Security Officer, plaintiff assisted the School Resource Officer in breaking up fights and escorting students to in-school suspension.  He also patrolled the campus, made sure students were reporting to class on time, prevented horseplay in the hallways, maintained order in the cafeteria, made sure the buses left safely and on time, and attended extra-curricular activities during school hours.[14]  He also helped the cafeteria workers clean up the cafeteria.[15]

## C.    Plaintiff's Knee Injury

---

[13] *Id.* at 65-66.

[14] Cobb Deposition, at 66, 72-74.

[15] *Id.* at 222-23.

In 1996, prior to plaintiff's employment by the Board and while he was working as a UPS driver, plaintiff tore the meniscus in his knee when he stepped out of his delivery truck.  The condition was treated with cortisone shots and an orthoscopic procedure, and plaintiff continued to work.  In 2002 or 2003, however, plaintiff continued to experience problems with his knee, so he underwent a total knee replacement procedure.  He did not return to work for UPS after his surgery, but his knee did improve, and he generally was able to do all the things he wanted to do.  The only subsequent knee problem plaintiff experienced was the development of scar tissue, which was removed through another orthoscopic procedure in 2004.[16]

Plaintiff also underwent a third orthoscopic procedure in 2010, after he became employed by the Board.  He asked Rod Shepard, the Principal of the Freshman Center, if he could use accrued sick leave for the procedure, and Shepard informed plaintiff that would not be a problem.[17]  Plaintiff remained absent from work from February 22 to May 17, 2010, while recovering from the third orthoscopic procedure.[18]  While plaintiff was out on leave, Sheppard told him that his presence at the school was missed, and that Sheppard would be glad when plaintiff could return to work.

---

[16] *Id.* at 37-41.

[17] *Id.* at 45-46, 78-79.

[18] *Id.* at 41-47, 77.

Sheppard did not use a "mean" or "malicious" tone when conveying that message.[19]

Plaintiff's knee responded well to the third orthoscopic procedure, and he was able to return to his job as Campus Security Officer from May 17, 2010 to May 28, 2010, the last day of school. Plaintiff also was able to resume his lawn care business in May of 2010. At the time of his September 24, 2012 deposition, plaintiff still maintained his lawn care business, and he also walked four miles approximately twice a week for exercise. Plaintiff never requested any job accommodations from the Board as a result of his knee problems, because he was able to perform the duties of his job, except for when he was out of work recovering from surgery in 2010.[20]

## D.    Termination of Plaintiff's Employment by the Board

Faced with budget cuts at the end of the 2009-2010 school year, the Board decided to eliminate the Security Officer positions at the Freshman Center and High School because the security concerns that led to the creation of those positions no longer were present.[21] Plaintiff appealed the Board's decision to eliminate his position. He lost the appeal, but he was placed on administrative leave, and he continued to be paid by the Board during the pendency of the appeal.[22]

---

[19] *Id.* at 162-63.

[20] Cobb Deposition, at 41-47, 77, 93-94.

[21] Defendant's evidentiary submission, Exhibit N (Affidavit of Dr. Kendy Behrends) ¶ 5.

[22] Cobb Deposition, at 75-76, 84-87, 91.

Kendy Behrends, the Board's Superintendent at the end of the 2009-2010 school year, found it "unfortunate" that plaintiff and Charles Johnson, the Security Officer at the High School, had lost their positions for reasons completely unrelated to their job performance, so she tried to assist both men in finding other employment with the Board.[23]   Behrends asked the Freshman Center and High School principals to tell plaintiff and Johnson that the Board still wanted them as employees, and that they should watch for new job postings.   She also asked that both plaintiff's and Johnson's e-mail accounts be left open, so they could correspond about job openings.[24]   Two positions in the Child Nutrition Program ("CNP") at the Freshman Center came open during the summer of 2010, and Behrends held both positions open for plaintiff.   She instructed the principal not to fill the positions until plaintiff had an opportunity to apply.   She also sent two e-mails to plaintiff inviting him to apply, and she asked plaintiff's Alabama Education Association ("AEA") representative to inform him of the openings.   If plaintiff had applied for either of the CNP jobs, Behrends intended to recommend that the Board hire him.[25]   However, plaintiff chose not to apply for the CNP position because it paid less than he had earned as a Campus

---

[23] Defendant's evidentiary submission, Exhibit B (Deposition of Kendy Behrends), at 17-18.

[24] *Id.* at 18-19.

[25] *Id.*; *see also* defendant's evidentiary submission, Exhibit I (Affidavit of Dr. Janet Womack), Exhibit D (Transcript of September 2, 2010 administrative hearing), at 91-99.

Security Officer.[26]

## E.      The Board's Process for Making Hiring Decisions

When a job announcement is posted, current employees of the Board apply by submitting a resume or letter of interest.  Non-Board-employees apply online.  The principal of the school is responsible for identifying the best applicants for each position.  The principal generally will form a committee of people familiar with the requirements of the position.   The committee reviews the applications, selects applicants to interview, and conducts the interviews.   After the interviews, the committee will inform the Superintendent which candidate it believes to be most qualified.  The Superintendent will then make a formal recommendation to the Board to hire that candidate, unless the Superintendent disagrees with the committee's selection.  The Superintendent's recommendation usually has been accepted by the Board.  In fact, Dr. Womack testified that she could not recall any occasion on which the Board disagreed with her recommendation for any position.[27]

## F.      Timeline For Plaintiff's Employment Applications and Complaints of Discrimination

Plaintiff has complained that the Board wrongfully failed to hire him for the following six positions:

---

[26] Cobb Deposition, at 92.

[27] Defendant's evidentiary submission, Exhibit C (Deposition of Dr. Janet Womack), at 19-22, 30-35.

a.    Special    Education    Teaching    Asst.,    Florence    Middle
      School/Freshman Ctr., posted 5/11/10, filled by Charles Johnson
      (filled after use of FMLA only)

b.    Custodian,  Florence  Middle  School/Freshman  Ctr.,  posted
      5/25/11, filled by Dwight Perkins (filled after filing of EEOC
      Charge and Amended Charge)

c.    Special Education Teaching Asst., Freshman Ctr., posted 8/1/11,
      filled by Christopher Lanzenstiel (filled after filing of EEOC
      Charge and Amended Charge)

d.    Custodian,  Florence  Middle  School/Freshman  Ctr.,  posted
      1/1/17[*sic*], filled by Joey Franklin (filled after filing of EEOC
      Charge, Amended Charge and Complaint)

e.    Custodian, Florence Middle School/Freshman Ctr., filled 5/18/12
      by Coretha Perkins (filled after filing of EEOC Charge, Amended
      Charge and Complaint)

f.    Custodian, Florence Middle School/Freshman Ctr., filed 5/18/12
      by Howard Brummett (filled after filing of EEOC Charge,
      Amended Charge and Complaint).[28]

**1.    Special Education Teaching Assistant position at the Freshman
       Center in May of 2010**

Plaintiff applied for a position as a Special Education Assistant at the Freshman

---

[28] Doc. no. 30, at 16 n.3.  Plaintiff originally complained about his failure to receive additional
positions, but he subsequently narrowed his claims.  *See id.* at 18 n.5 ("Plaintiff focuses his
complaints of retaliation and/or discrimination with respect to this Summary Judgment response on
the six positions in which Roderick Sheppard was a decision maker and which are listed in Footnote
3 . . . .  Although Plaintiff believes that he was retaliated against by others at the Board's main
office, given that he was never granted an interview after he filed his Charge of Discrimination, his
discovery did not reveal any information upon which he can rely to overcome summary judgment
other than with respect to positions for which Roderick Sheppard was a member of the interview
committee which made the recommendation of whom to hire to the Superintendent.").

Center in May of 2010.[29]  Roderick Sheppard, the Principal at the Freshman Center,

formed an interview committee for that position, together with Marie Matlock, the

Assistant Principal at the Middle School.  Dr. Behrends asked the committee to

strongly consider the applications of both plaintiff and Charles Johnson, the other

Security Officer whose position also had been eliminated.[30]

The Job Description for the Special Education Assistant position states the

minimum qualifications as being a high school diploma or its equivalent.[31]  The "Job

Goal" is to "help the teacher accomplish teaching objectives by working with

individual students or small groups to help them achieve the skill levels of the class

as a whole."[32]  The Performance Responsibilities for the position include:

1.   Administers, scores and records such achievement and diagnostic
tests as the teacher recommends for individual students.

---

[29] Cobb Deposition, at 97.

[30] Cobb Deposition, at Exhibit 11; Behrends Deposition, at 41-42; defendant's evidentiary submission, Exhibit E (Deposition of Roderick Sheppard), at 34-35.

By way of background, what the court has been referring to as the "Freshman Center" actually was comprised of both Florence Middle School and Florence Freshman Center — two separate schools on a shared campus.  Roderick Sheppard is the Principal at Florence Freshman Center, and Aimee Rainey is the Principal at Florence Middle School.  The two schools have shared responsibility for the Child Nutrition Program, custodial services, School Resource Officers, transportation services, and library/media services.  Rainey primarily oversees the shared transportation program, and Sheppard primarily oversees the shared custodial program.  Womack Affidavit ¶ 24.

[31] Womack Deposition, at Exhibit 15 (Job Description).  The copy of the job description in the record states that is for a "Teacher Aide" position, but it appears undisputed that it is the same position as "Special Education Assistant."

[32] Id. at 1.

2.      Works with individual students or small groups of students to reinforce learning of material or skills initially introduced by the teacher.

3.      Assists the teacher in devising special strategies for reinforcing material or skills based on a sympathetic understanding of individual students, their needs, interests and abilities.

4.      Operates and cares for equipment used in the classroom for instructional purposes.

5.      Helps students master equipment of instructional materials.

6.      Distributes and collects workbooks, papers and other materials for instruction.

7.      Guides independent study, enrichment work and remedial work set up and assigned by the teacher.

8.      Assists with the supervision of students during emergency drills, assemblies and field trips.

9.      Alerts the teacher to any problem or special information about an individual student.

10.     Serves as the chief source of information and assistance to a substitute teacher.

11.     Maintains the same high level of ethical behavior and confidentiality of information about students as is expected of fully licensed teachers.

12.     Participates in in-service training programs, as assigned.[33]

Plaintiff and Johnson both interviewed for the position, and the committee

---

[33] *Id.*

recommended Johnson.  Sheppard stated that Johnson was selected because he had a good rapport with all students at the High School while serving as Security Officer, because he was a demonstrated community leader, and because he had worked with special needs children at the Alternative School.[34]   Even so, Johnson had never actually served as a Teaching Assistant in special education.[35]   There also is no evidence of Johnson ever taking medical leave or having any sort of disability while employed by the Board.[36]

Additionally, Sheppard and Matlock had indicated to the selection committee that, when plaintiff was employed at the Freshman Center, there were many occasions on which they looked for him but could not find him, because he was not working where he was supposed to be working.[37]   Plaintiff denies ever being absent from his assigned work station "without permission or without having signed out in the office."[38]   He explained that the hand-held radio he carried to maintain contact with school administrators had poor reception and did not always pick up the administrators' calls.[39]   He also stated that he did not always have a single assigned

---

[34] Sheppard Deposition, at 40-46; defendant's evidentiary submission, Exhibit G (Deposition of Lynn Sharp), at 20-22.

[35] Sheppard Deposition, at 40-41.

[36] *Id.* at 42-43.

[37] *Id.* at 26-28, 56-57, 78-80; Sharp Deposition, at 23.

[38] Plaintiff's evidentiary submission, Exhibit A (Declaration of Vincent E. Cobb) ¶ 4.

[39] *Id.* ¶ 5.

work station, because he often was required to walk around the campus to ensure that students were not skipping class.[40]  Plaintiff was never reprimanded or written up for being away from his assigned work station, or for any other infraction.[41]  The only occasion on which plaintiff could recall discussing an absence from campus with Sheppard was when plaintiff had to leave campus to renew a license.  Plaintiff followed the appropriate procedure by signing out before he left campus.  The renewal process took longer than anticipated, so Sheppard called plaintiff to ask when he would be able to return.  Plaintiff informed Sheppard that he might need to take a half-day of vacation to cover the time he would be away.  Sheppard did not indicate to plaintiff that he disapproved of plaintiff's absence that day.[42]

Based on the committee's selection, Dr. Behrends recommended Johnson for the Special Education Teaching Assistant position.   When she made that recommendation, Dr. Behrends was unaware that plaintiff had any problems with his knee, or that he taken leave for knee surgery.  The Board approved Dr. Behrends' recommendation, and it made the final decision to hire Johnson on June 3, 2010.[43]

### 2.    Plaintiff's EEOC charges

---

[40] *Id.* ¶ 6.

[41] *Id.* ¶ 3.

[42] *Id.* ¶ 7.

[43] Behrends Affidavit ¶ 8.

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 17, 2010.  He alleged discrimination on the basis of race, color, sex, age, disability, and retaliation in the termination of his employment, and in the Board's failure to award four positions for which he had submitted applications.  Those positions included the Special Education Teaching Assistant position from May of 2010, as well as three other positions that are not at issue in this lawsuit.[44]  He filed an amended charge on May 3, 2011, alleging that he failed to receive a position as Custodian at Weeden Elementary School in January of 2011 as a result of retaliation and discrimination on the basis of race, color, sex, age, and disability.[45]

### 3.    Custodian position at the Freshman Center in May of 2011

Plaintiff applied for a position as Custodian at the Freshman Center that was posted on-line in May of 2011.[46]  The Board received thirty-three applications for that position.  Sheppard formed an interview committee and selected candidates to be

---

[44] *See* Complaint, at Exhibit A (December 17, 2010 EEOC Charge).  Even though plaintiff is not specifically complaining of his failure to receive the three other positions as part of his claims in this lawsuit, the fact that he filed an EEOC charge with regard to those positions is relevant to his later claims of retaliation.

[45] *See* Complaint, at Exhibit B (May 3, 2011 EEOC Charge).  Again, plaintiff is not specifically complaining of his failure to receive the Custodian position at Weeden Elementary School as part of his claims in this case, but the fact that he filed an amended EEOC charge with regard to that position is relevant to his later claims of retaliation.

[46] Cobb Deposition, at 220.

interviewed.  Plaintiff was not among the candidates who received an interview.[47]  The interview committee recommended that the Superintendent select Dwight Perkins. Perkins had more than ten years of experience as a custodian in another school system, for the University of North Alabama, and for a private business.  He also had served as a substitute custodian at the Freshman Center and done a good job.[48]

Sheppard stated that, when the interview committee recommended Perkins for the Custodian position at the Freshman Center in May of 2011, he did not know that plaintiff had filed an EEOC charge or otherwise complained of discrimination or retaliation.[49]  Dr. Womack — who succeeded Dr. Behrends as the Superintendent of Education upon Behrends' retirement on July 1, 2010 — testified that she had discussed some of the allegations in plaintiff's EEOC charge with Sheppard before the Board submitted its response to the charge on January 18, 2011.[50]  For confidentiality reasons, however, she did not directly inform Sheppard that plaintiff had filed an EEOC charge.  Instead, she simply told him that the Board was dealing with "a legal question."[51]  It is undisputed that, after plaintiff filed his EEOC charge, he was never

---

[47] Defendant's evidentiary submission, Exhibit J (Affidavit of Roderick Sheppard) ¶ 6.

[48] *Id.* ¶ 7.

[49] *Id.*

[50] Womack Deposition, at 48-50, 102.

[51] *Id.* at 48-50.  *See also* Sheppard Deposition, at 63-65.

selected to interview for any other position for which he applied.[52]

Based on the committee's selection of Perkins, Dr. Womack recommended that the Board hire Perkins for the position, and the recommendation was approved.  Dr. Womack was not aware at the time she recommended Perkins that plaintiff had applied for the position.[53]

### 4.    Special Education Teaching Assistant position at the Freshman Center in August of 2011

Plaintiff applied for a position as a Special Education Teaching Assistant at the Freshman Center that was posted on-line in August 2011.[54]  This Teaching Assistant position was to assist the special education teacher in providing classroom instruction, and not to provide one-on-one caretaker duties for a specific student.[55]  The Board received seventy-three applications for that position.  Sheppard formed an interview committee that included Special Education Coordinator Lynn Sharp.  Plaintiff was not among the candidates who received an interview.[56]  The interview committee recommended that the Superintendent select Christopher Lanzenstiel for the position. Sheppard thought Lanzenstiel had a good interview, and he also had three years of

---

[52] Cobb Declaration ¶ 8.

[53] Womack Affidavit ¶ 31; *see also* Womack Deposition, at 17.

[54] Cobb Deposition, at 223-25.

[55] Sheppard Affidavit ¶ 8.

[56] *Id.* ¶ 9; Cobb Deposition, at 233-34; Womack Affidavit ¶ 35.

experience as a special education teacher in Germany.[57]

Based upon the committee's selection of Lanzenstiel, as well as upon Lanzenstiel's experience, Dr. Womack recommended that the Board hire Lanzenstiel for the position, and the recommendation was approved.  When she made that recommendation, Dr. Womack did not know that plaintiff had applied for the position.[58]

### 5.    Plaintiff's complaint in this case

Plaintiff did not file an amended or additional EEOC charge addressing his failure to receive any employment positions after February of 2011.[59]  He filed this case on December 8, 2011.[60]

### 6.    Custodian position at the Freshman Center in January of 2012

Dwight Perkins, who received the position as Custodian at the Freshman Center in May of 2011, transferred to Florence High School in January of 2012.[61]  The Board then advertised to fill Perkins' vacant position as the Custodian at the Freshman Center.  Plaintiff applied for that position, as did thirty-two other people.[62]  Sheppard

---

[57] Sheppard Affidavit ¶ 10; Womack Affidavit ¶ 36.

[58] Womack Affidavit ¶ 37.

[59] *Id.* ¶ 49.

[60] *See* Complaint.

[61] Plaintiff also applied for the position at the High School, but his failure to receive that position is not part of his claims in this case.  *See* Cobb Deposition, at 241.

[62] *Id.* at 247-48; Sheppard Affidavit ¶ 12.

and Auty Horn, the Assistant Principal of Florence Middle School, formed an interview committee.  Plaintiff was not among the candidates who received an interview.[63]  The interview committee recommended that the Superintendent select Joey Franklin for the position.  Franklin had a good interview, and he had experience performing custodial duties at a church where he also served as pastor.[64]

Based upon the committee's selection of Franklin, Dr. Womack recommended that the Board hire Franklin for the position, and the recommendation was approved. When Dr. Womack made that recommendation, she did not know that plaintiff had applied for the position.[65]

### 7.   Two Custodian positions at the Freshman Center in May of 2012

The Board advertised two open positions for Custodian at the Freshman Center during May of 2012.  Plaintiff applied for both positions, but he did not receive an interview for either.[66]  The interview committee, which was formed by Sheppard and Horn, selected Howard Brummett and Ceretha Perkins as the best candidates for the two positions.  Brummett had experience as a custodian in another state, and he had done a good job as a substitute custodian at the Freshman Center.  Perkins had

---

[63] Sheppard Affidavit ¶ 12.

[64] *Id.* ¶ 13.

[65] Womack Affidavit ¶ 42.

[66] Cobb Deposition, at 251-60.

experience as a housekeeper, and she had done such a good job as a substitute custodian at the Freshman Center that many of the teachers lobbied for her to receive the permanent Custodian position.[67]

Based upon the committee's selection of Brummett and Perkins, as well as on those candidates' experience, Dr. Womack recommended that the Board hire Brummett and Perkins for the two Custodian positions, and the recommendation was approved. When she made those recommendations, Dr. Womack did not know that plaintiff had applied for either Custodian position.[68]

### III. DISCUSSION

#### A. Claims Abandoned by Plaintiff

In plaintiff's brief in response to defendant's motion for summary judgment, he "concedes that he cannot prove that the elimination of his position as a Security Officer in May 2010 violated [the FMLA, Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983,] or the 14th Amendment."[69] Thus, plaintiff cannot proceed with any claim related to the termination of his employment.

Moreover, plaintiff has narrowed his failure to hire claims to the six positions listed in Section II(F), *supra.* The court will not consider any claims related to

---

[67] Sheppard Affidavit ¶ 16.

[68] Womack Affidavit ¶¶ 44-45.

[69] Doc. no. 30 (plaintiff's response brief), at 16 n.2 (alteration supplied).

plaintiff's failure to receive any other positions.

**B.     Americans With Disabilities Act**

Plaintiff has conceded that any ADA claim related to the Special Education Teaching Assistant position at the Freshman Center that was filled by Charles Johnson in May 2010 would be time-barred.[70]  He maintains, nevertheless, that defendant's failure to hire him for the other five positions specified in Section II(F), *supra,* constituted disability discrimination in violation of the ADA.

"In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of an ADA violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases." *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001); *see also, e.g., Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999) ("The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims.") (citing *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996)).

To establish a *prima facie* case of disability discrimination, plaintiff must demonstrate:  (1) that he has a "disability" within the meaning of the Act; (2) that he is "a qualified individual with a disability," meaning that he can perform the essential

---

[70] *See* doc. no. 30, at 30 n.10.

functions of the employment position he holds or seeks, with or without reasonable accommodation being made by the employer;[71] and (3) that he suffered an adverse employment action because of his disability.  *See, e.g.*, *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).

Plaintiff cannot establish a *prima facie* case because he cannot show that he has a "disability" within the meaning of the ADA.  The Act defines the concept of "disability" three ways — that is, as including any person: (A) who has "a physical or mental impairment that substantially limits one or more major life activities of such individual"; or (B) who has a "record" of such an impairment; or (C) who is "regarded as" having such an impairment.  42 U.S.C. § 12102(1); *see also* 29 C.F.R. § 1630.2(g).  "An individual is deemed to be 'disabled' for purposes of the ADA if he satisfies any one of these three enumerated definitions."  *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

Plaintiff has not argued that he has an impairment that substantially limits one

---

[71] *See* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *see also* 29 C.F.R. § 1630.2(m) ("The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position.").

of his major life activities.  Stated differently, he has not asserted that he actually is under a "disability," as defined by the ADA.  Instead, he contends that defendant *regarded him* as being disabled.  The ADA provides that

> [a]n individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. 12102(3)(A) (alteration supplied).  An individual will not be "regarded as" having a disability based on "impairments that are transitory and minor.  A transitory impairment is an impairment with an actual or expected duration of 6 months or less."  42 U.S.C. 12102(3)(A).  *See also* 29 C.F.R. §§ 1630.2(g)(1)(iii), 1630.2(*l*).

Plaintiff asserts that Sheppard regarded him as being disabled because of his knee problems.  According to plaintiff,

> Sheppard was aware of Cobb's knee problems and that he had to miss a substantial amount of work for surgery and recovery related to his knee. Prior to his becoming symptomatic, Sheppard had not written Cobb up for poor performance or for allegedly not being at his work station. After Cobb's position was eliminated he applied for multiple positions which all required substantial walking and standing. . . .  Although he had done the duties of a Special Education Teaching Assistant and custodial duties while employed by the Defendant, Sheppard refused to place Cobb in any of the positions for which he applied and refused even to offer him an interview for the last five positions.[72]

The evidence does support plaintiff's assertion that Sheppard was aware of

---

[72] Doc. no. 30, at 31-32.

plaintiff's knee surgery and subsequent absence from work. Even so, plaintiff's knee problem cannot be considered any more than a transitory or minor impairment. The only knee-related problem plaintiff suffered *while employed by the Board* was an orthoscopic procedure in 2010. He was out of work for approximately three months, from February 22 to May 17, 2010, to recover from the procedure. There is no indication that plaintiff suffered any significant impairments as a result of the procedure after May of 2010. To the contrary, plaintiff not only returned to his job as a Campus Security Officer at the Freshman Center at the end of May; he also resumed his lawn care business, and he was able to walk four miles approximately twice each week.

Moreover, even if plaintiff's knee surgery could be considered more than a minor or transitory impairment, there is no evidence connecting that impairment to the Board's decisions not to hire plaintiff for the five positions still at issue. The first position of which plaintiff complains is the Freshman Center Custodian from May of 2011. By that time, more than a year had passed since plaintiff returned to work from the orthoscopic procedure, and there is no indication that the Board perceived plaintiff as continuing to suffer from any impairment. *See Butler v. Advance/Newhouse Partnership*, No. 6:11-cv-1958-0Orl-28GJK, 2013 WL 1233002, *8 (M.D. Fla. Mar. 26, 2013) (slip copy) ("At most, there is evidence that Advance knew that Butler was

experiencing some back pain, was about to have back surgery, and was about to take FMLA leave to recover for that surgery; this alone, however, is not evidence that Advance regarded her as disabled within the meaning of the ADA.").

Based on the foregoing, the court concludes that plaintiff does not have sufficient evidence to survive defendant's motion for summary judgment on his ADA claim. Moreover, because summary judgment is due to be granted on the merits on plaintiff's ADA claim, there is no need to consider defendant's alternative argument: *i.e.,* that plaintiff failed to exhaust his administrative remedies on that claim.

## C.    Retaliation

Plaintiff also has alleged that his failure to receive all six positions identified above was the result of unlawful retaliation, in violation of Title VII, the FMLA, 42 U.S.C. § 1981, and 42 U.S.C. § 1983.

### 1.    42 U.S.C. § 1983

Plaintiff's § 1983 claim is based upon alleged violations of the Equal Protection Clause of the Fourteenth Amendment.[73]  The Eleventh Circuit has clearly held that "a constitutional claim for retaliation may be brought under 42 U.S.C. § 1983 pursuant to the *first amendment*, **not the equal protection clause**." *Ratliff v. DeKalb County,*

---

[73] *See, e.g.,* Complaint ¶ 18 ("Defendant violated Plaintiff's . . . Fourteenth Amendment equal protection rights by terminating him from his position and retaliated against him by refusing to place Plaintiff in other positions for which he was qualified or the most qualified applicant after he made a complaint of discrimination.").

*Ga.*, 62 F.3d 338, 341 (11th Cir. 1995) (italicized emphasis in original, boldface emphasis supplied).  Accordingly, summary judgment will be granted on all of plaintiff's retaliation claims asserted pursuant to § 1983 and the Fourteenth Amendment.

### 2.    Title VII, the FMLA, and 42 U.S.C. § 1981

#### a.    Principles of law common to all statutes

The FMLA grants an eligible employee the right to take up to twelve workweeks of unpaid leave annually for any one (or more than one) of several reasons specified in the Act, including "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D) (alteration supplied).  The FMLA creates a private right of action against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" rights provided by the Act.  29 U.S.C. §§ 2615(a)(1), 2617(a); *see also, e.g.*, *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 724-25 (2003); *Hurlbert v. St. Mary's Health Care*, 439 F.3d 1286, 1293-94 (11th Cir. 2006).

The Eleventh Circuit has recognized that "§ 2615(a) creates two types of claims:  '*interference claims*, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and *retaliation claims*, in which an employee asserts that his employer discriminated against him

because he engaged in activity protected by the Act.'" *Hulbert*, 439 F.3d at 1293

(quoting *Strickland v. Water Works & Sewer Board of the City of Birmingham*, 239

F.3d 1199, 1206 (11th Cir. 2001)) (emphasis supplied, internal citations omitted).

Plaintiff has asserted the latter type of claim in this case.

In order to establish a claim for FMLA retaliation, "an employee must show

that his employer intentionally discriminated against him for exercising an FMLA

right." *Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1267 (11th Cir.

2008); *see also* 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c).   Unlike an

interference claim, an employee "bringing a retaliation claim faces the increased

burden of showing that his employer's actions were motivated by an impermissible

retaliatory or discriminatory animus." *Strickland*, 239 F.3d at 1207 (internal quotation

marks omitted).  Where, as here, the plaintiff seeks to prove intentional retaliation

with circumstantial evidence, the court must analyze the case under the *McDonnell

Douglas* burden-shifting framework.  *See, e.g.*, *Strickland*, 239 F.3d at 1207.  Under

that framework, the plaintiff bears the initial burden of presenting sufficient evidence

to allow a reasonable factfinder to determine that he has satisfied the elements of a

*prima facie* case.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  A

*prima facie* case of retaliation under the FMLA requires a showing that:  (1) the

employee engaged in statutorily protected conduct; (2) the employee suffered an

28

adverse employment action; and (3) there is a causal connection between the two. *See, e.g.*, *Smith v. BellSouth Telecommunications, Inc.*, 273 F.3d 1303, 1314 (11th Cir. 2001).

The process is much the same for evaluating a claim of retaliation under Title VII.  "Retaliation is a separate violation of Title VII."  *Gupta v. Florida Board of Regents,* 212 F.3d 571, 586 (11th Cir. 2000).  A plaintiff generally must prove three elements to establish a *prima facie* case:  (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action.  *See, e.g., Shannon v. BellSouth Telecommunications, Inc*., 292 F.3d 712, 715 (11th Cir. 2002).

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer a legitimate reason for the adverse action . . . .  The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory conduct.

*Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000) (citations omitted) (alteration supplied).

Finally, the Eleventh Circuit has held that the elements of proof for any claim of discrimination or retaliation are the same under both Title VII and § 1981.  *See, e.g., Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Thus, the same analysis will be used to evaluate *all* of plaintiff's retaliation claims, regardless of whether they arise are based upon the FMLA, Title VII, or 42 U.S.C. § 1981.

**b.   Evaluation of each position for which plaintiff applied**

**i.   Special Education Teaching Assistant position at the Freshman Center in May of 2010**

Plaintiff acknowledges that this claim can be pursued only under the FMLA.[74] It is not entirely clear from defendant's briefs whether defendant contests plaintiff's ability to satisfy the *prima facie* case for FMLA retaliation with regard to this position.  Even so, a brief analysis reveals that plaintiff can satisfy all the requisite elements.  Plaintiff returned to work from protected FMLA leave on May 17, 2010, and the Special Education Teaching Assistant position at the Freshman Center, which was posted in May of 2010, was awarded to another candidate on June 3, 2010.  The close temporal proximity between plaintiff's return from leave and his failure to receive the position indicates a causal connection between his protected activity and the subsequent adverse employment action.  *See, e.g., Martin*, 543 F.3d at 1268 ("[T]he close temporal proximity between the two — Martin was terminated while on FMLA leave — is more than sufficient to create a genuine issue of material fact of

---

[74] *See* doc. no. 30, at 18 n.5 ("[F]or this particular position, [plaintiff] limits his claim to FMLA retaliation.") (alterations supplied).

causal connection.") (citing *Hulbert*, 439 F.3d at 1298 (alteration supplied); *Farmer v. Bisk Education, Inc.*, No. 8:08-cv-00239-JDW-EAJ, 2009 WL 2246137, at *5 (M.D. Fla. July 27, 2009) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.") (quoting *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (internal quotation marks omitted).

The Board offered legitimate, non-discriminatory reasons for choosing Charles Johnson over plaintiff for the Special Education Teaching Assistant position:

> The interview committee interviewed both [plaintiff Vincent Edward] Cobb and Charles Johnson and it found Johnson to be the better candidate. While Johnson worked as a security officer at Florence High School, he had demonstrated a very good rapport with students and did a good job of developing relationships with students. Johnson had shown an ability to work with special needs children at the Alternative School. Johnson had also shown outside of school that he was a community leader.[75]

Plaintiff asserts that these proffered reasons are actually a pretext for retaliatory animus. Plaintiff's burden at the pretext stage is that of "cast[ing] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct' . . . ." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538

---

[75] Doc. no. 25 (defendant's summary judgment brief), at 34 (alteration supplied).

(11th Cir. 1997) (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)) (alterations supplied); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135 (2000) ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.") (alteration supplied).   Plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996) (*en banc*) (internal quotation marks omitted).

Plaintiff first asserts that "there is no dispute but that Cobb met the minimum qualifications for the position[] for which he applied and that he had more experience in that position than Johnson."[76]  Plaintiff does not explain that conclusory statement any further, nor does he point to any evidence to support it.  "In the context of a promotion, 'a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted.'" *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1349 (11th

---

[76] Doc. no. 30, at 20 (alteration supplied).

Cir. 2007) (citing *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006) (in turn citing *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000))) (alteration in original).  "Instead, a plaintiff must show that the disparities between the successful applicant's and his own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Springer*, 509 F.3d at 1349 (citing *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004)).  *See also Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456-57 (2006).

The record does not demonstrate that plaintiff was so much more qualified than Johnson that no reasonable decision maker could have chosen Johnson over plaintiff. Plaintiff did have experience as a Special Education Teaching Assistant, but his assignment was to work one-on-one with a student with behavioral issues in order to keep the student calm and controlled in furtherance of the learning environment.  The position for which plaintiff applied in May of 2010, in contrast, had more instructional requirements, including administering tests, reinforcing learned material, assisting with use of instructional equipment, and distributing assignment materials.  The position also required the Assistant to work with groups of students in a classroom setting or during field trips, not the one-on-one work plaintiff to which plaintiff was accustomed in his previous position.  Johnson, on the other hand, had experience

working with larger numbers of special needs students at the alternative school, and he demonstrated during his service as a Security Officer at the High School that he was skilled at developing relationships with students.  Neither applicant had previous experience in the *exact* position for which both had applied, and it was not unreasonable, or unlawful, for the Board to consider Johnson's previous experience and demonstrated skill set to be more valuable to the position than plaintiff's.

Plaintiff's second pretext argument is that "Sheppard was on the selection and interview panels for that position and Sheppard had indicated to Cobb that Cobb's presence was needed at the school while he was on FMLA leave and that Cobb's being out of school for his knee was not an option."[77]  The record does not support plaintiff's assertion.  Although plaintiff did allege *in his complaint* that Sheppard had made those statements,[78] he testified during his deposition that Sheppard's statements were of a very different nature.  For clarity, the court will reiterate the relevant portion of plaintiff's deposition in full:

> Q:   And then the last sentence [of the EEOC charge] says, "The Principal indicated to me on more than one occasion that my presence would be needed at the school as per my employment and being out for

---

[77] Doc. no. 30, at 20.

[78] *See* Complaint ¶ 9 ("Plaintiff had been informed by the principal after his surgery that his presence was needed at the school and that being out for Plaintiff's knee was not an option."); *id.* at Exhibit A (December 17, 2010 EEOC Charge) ("The Principal had indicated to me on more than one occasion that my presence would be needed at the school as per my employment and being out for my knee was not an option.").

me was not option."

A.     No, he had said that my absence was missed, that he missed — my absence being there due to the fact that they were [sic] only one officer present.  And that he would be — appreciate it if I could get back to work as soon as possible.

Q.     So when you say "he," we are talking about Mr. Sheppard, correct?

A.     Yeah, um-hum.

Q.     When did Mr. Sheppard say that to you?

A.     I don't remember the actual date.  But, like I said, I think I visited the school once or twice during that time that I had surgery.  And he would ask me when I had planned on coming back to work.

Q.     Okay.  Is this between — Did he say this to you between February 22nd, 2010, and May 17th, 2010?

A     Yes, sir.

Q.     Okay.  And what exactly, I mean, what specifically did he say to you?

A.     *It wasn't anything mean and malicious.  He just said that my presence was missed and that he would be glad when I can turn — that he hoped I can return back to work as soon as possible.*

Q.     Okay.  Did he say anything else that you can recall?

A.     Huh-uh, *that was the gist of his conversation.  That was all that was said.*[79]

Sheppard's statements as they were recounted in plaintiff's deposition testimony do

---

[79] Cobb Deposition, at 162-64 (emphasis and alteration supplied).

not indicate a retaliatory motive, and they do nothing to discredit any of defendant's proffered legitimate reasons for choosing Johnson over plaintiff for the position.

Finally, plaintiff attempts to discredit any suggestion by defendant that he could not always be found at his assigned work station.  As plaintiff's absence from his work station was not one of defendant's proffered legitimate, non-retaliatory reasons for not choosing plaintiff for the position, the truth or falsity of defendant's claims is irrelevant.

### ii.   Custodian position at the Freshman Center in May of 2011

Defendant asserts that plaintiff cannot establish a *prima facie* case of retaliation for this position because he cannot demonstrate a causal connection between any protected activity and the adverse employment action.[80]  To establish a causal connection at the summary judgment stage, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).  "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment

---

[80] Defendant does not contest the other elements of the *prima facie* case.  Indeed, it is clear that plaintiff engaged in protected activity when he took FMLA leave and filed an EEOC charge, and that he suffered an adverse employment action when he did not receive the position.

action." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). *Accord Raney v. Vinson Guard Service, Inc*., 120 F.3d 1192, 1197 (11th Cir. 1997) ("[A] plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action.") (alteration supplied). *See also*, *e.g.*, *Gupta*, 212 F.3d at 590 ("[A] plaintiff must show that 'the decisionmakers were aware of the protected conduct,' and 'that the protected activity and the adverse action were not wholly unrelated.'") (quoting *Farley v. Nationwide Mut. Ins*., 197 F.3d 1322, 1337 (11th Cir. 1999)) (alteration supplied). "Close temporal proximity between the protected activity and the adverse action *may* be sufficient to show that the two were not wholly unrelated." *Bass v. Bd. of County Commissioners,* 256 F.3d 1095, 1119 (11th Cir. 2001) (citing *Gupta*, 212 F.3d at 590) (emphasis supplied).

With regard to plaintiff's FMLA retaliation claim, he cannot demonstrate a causal connection because the decision about the Custodian position at the Freshman Center was not made until May of 2011, *a full year* after plaintiff returned from FMLA leave. The Eleventh Circuit has held that a time gap of even a few months is too long to support a causal connection. *See Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004). The year-long gap here clearly is too long, standing alone, to support a causal connection. Plaintiff responds to this point by stating that, "between

37

December 2010, and January 18, 2011, a jury could conclude Sheppard was reminded of Plaintiff's FMLA leave when Womack contacted him about Plaintiff's charge of discrimination, thus restarting the time clock on temporal proximity."[81]  Plaintiff cites no authority, and the court knows of none, to support this "restarting the time clock" theory.  Moreover, there is no evidence in the record to support the theory.  Plaintiff's attorney never asked Sheppard any questions during his deposition regarding whether he was reminded of plaintiff's FMLA leave when Womack asked him about some of the allegations in plaintiff's EEOC charge.  Plaintiff's argument is too speculative; therefore, plaintiff cannot support a *prima facie* of retaliation under the FMLA for this position.

With regard to plaintiff's Title VII and § 1981 retaliation claims, defendant asserts that plaintiff cannot establish a causal connection because "[t]here is no evidence that anyone on the interview committee knew Cobb had filed an EEOC Charge or otherwise complained of discrimination or retaliation."[82]  It is true that Sheppard stated in his affidavit that, when the interview committee selected Perkins for the Custodian position at the Freshman Center in May of 2011, he did not know that plaintiff had filed an EEOC charge or otherwise complained of discrimination or retaliation.  Even so, plaintiff has presented contradictory evidence.  Dr. Womack

---

[81] Doc. no. 30, at 25.

[82] Doc. no. 25, at 42 (alteration supplied).

testified that she had discussed some of the allegations in plaintiff's EEOC charge with Sheppard before the Board submitted its response to the charge on January 18, 2011. Even though Dr. Womack did not specifically inform Sheppard that plaintiff had filed an EEOC charge, she did tell Sheppard that her questions about plaintiff related to a "legal problem." Thus, even if Sheppard did not have specific knowledge that plaintiff had filed an EEOC charge, a reasonable jury could conclude that plaintiff was aware that plaintiff had filed some sort of discrimination complaint. Sheppard's knowledge, coupled with the close temporal proximity between the date of plaintiff's amended charge (May 3, 2011) and the Board's decision not to award him the Custodian position at the Freshman Center in May of 2011 is enough to establish a causal connection. Accordingly, plaintiff has satisfied the *prima facie* case for his claim of retaliation relating to this position.[83]

Even so, defendant has proffered a legitimate, non-retaliatory reason for selecting Dwight Perkins instead of plaintiff for the position. Defendant states that Perkins was more qualified for the position because he had over ten years of experience as a custodian, including work for a university and a private business. Plaintiff, in contrast, had never held a custodian position, even though some of his

---

[83] Because plaintiff has established Sheppard's knowledge of his protected activity, there is no need to consider plaintiff's alternative argument that Dr. Womack, who undisputedly knew about plaintiff's EEOC charge, was merely Sheppard's "cat's paw."

previous jobs had required him to perform some custodial duties.

Plaintiff asserts that defendant's proffered reason is merely a pretext for retaliation.  Specifically, he states:

> [G]iven that Cobb was not allowed to interview for the position, that part of Cobb's duties as Security Officer involved custodial duties, the comments Sheppard had made about Cobb's leave for his knee surgery and recovery, that Womack had discussed the allegations of the EEOC charge with Sheppard some time between December 17, 2010 and January 18, 2011, and that Perkins was not disabled, had not filed an EEOC charge and had not utilized FMLA leave, a jury could conclude that Defendant's articulated reason for its actions was pretextual for unlawful retaliation.[84]

Sheppard's comments about plaintiff's FMLA leave, Perkins' non-use of FMLA leave, and Perkins' lack of a disability are not relevant to plaintiff's retaliation claim under Title VII and § 1981.  Sheppard's awareness of plaintiff's EEOC charge was relevant to plaintiff's *prima facie* case, but it does nothing to undercut defendant's proffered legitimate, non-discriminatory reasons.   The fact that Perkins, unlike plaintiff, had never filed a EEOC charge might constitute *some* evidence to support plaintiff's retaliation claim, but it does not disprove defendant's proffered legitimate, non-discriminatory reasons.  Most importantly, given Perkins' ten years of experience as a custodian, including in an educational setting, there is no evidence of such a disparity between plaintiff's and Perkins' qualifications that no reasonable person

---

[84] Doc. no. 30, at 26 (alteration supplied).

could have selected Perkins over plaintiff.  *See Springer,* 509 F.3d at 1349.  Finally, the fact that plaintiff did not receive an interview serves only to reinforce defendant's view that plaintiff was not as qualified as other candidates, including Perkins.

Because plaintiff has not demonstrated that defendant's proffered legitimate reasons for not selecting plaintiff for the Custodian position at the Freshman Center in May of 2011 were a mere pretext for retaliation, summary judgment is due to be granted with regard to that position.

### iii.   Special Education Teaching Assistant position at the Freshman Center in August of 2011

As with the previous position, defendant asserts that plaintiff cannot establish a *prima facie* case of retaliation for the Special Education Teaching Assistant position at the Freshman Center in August of 2011 because he cannot show a causal connection between any protected activity and the adverse employment action.  As with the previous position, plaintiff cannot demonstrate a causal connection for his FMLA retaliation *prima facie case* on this position because the hiring decision was not made until more than a year after plaintiff returned from FMLA leave.  Plaintiff can, however, establish a *prima face* case with regard to his Title VII and § 1981 retaliation claims, because a reasonable jury could conclude that Sheppard was aware that plaintiff had filed a discrimination complaint, and that the temporal proximity between plaintiff's amended EEOC charge and the Board's decision not to hire him

for the position indicates a causal connection.

Even so, defendant has offered a legitimate, non-retaliatory reason for selecting Christopher Lanzensteil instead of plaintiff for the position. Defendant states that Lanzensteil was more qualified than plaintiff because he had three years of experience instructing children with various disabilities as a Special Education Teacher in Germany. Plaintiff, in contrast, did not have any experience as a teacher. He had experience as a Special Education Teaching Assistant, but he did not have any instructional responsibilities in that position. Instead, he was assigned to a single student with behavioral issues to maintain order and calmness.

Plaintiff asserts that defendant's proffered reason is really a mere pretext for retaliation. Specifically, plaintiff states:

> [G]iven that the position did not require teaching experience, that Cobb was not allowed to interview for the position, that Cobb had previously done the job, the comments Sheppard had made about Cobb's leave for his knee surgery and recovery, that Plaintiff had filed an EEOC Charge some nine (9) months before, that Womack had discussed the allegations of the EEOC charge with Sheppard some time between December 17, 2010, and January 18, 2011, and that Lanzenstiel was not disabled, had not filed an EEOC charge and had not utilized FMLA leave, a jury could conclude that Defendant's articulated reason for its actions was pretextual for retaliation.[85]

As discussed in connection with the previous position, these arguments do nothing to disprove or discredit defendant's proffered legitimate, non-retaliatory reasons. Most

---

[85] Doc. no. 30, at 27 (alteration supplied).

importantly, there is no evidence of such a disparity between plaintiff's and Lanzenstiel's qualifications that no reasonable person, in the exercise of impartial judgment, could have selected Lanzenstiel over plaintiff.  While plaintiff had served as a Special Education Teaching Assistant before, it was only to work with a large male special needs student who had suffered a brain injury and sometimes was a behavioral problem, but *not* to provide instruction.  Lanzenstiel, on the other hand, had instructional experience as a Special Education teacher in Germany.  Even though teaching experience was not a requirement for the Special Education Teaching Assistant position, it was reasonable for the Board to value Lanzenstiel's instructional experience as a teacher over plaintiff's less relevant experience as a Teaching Assistant assigned to maintain the calmness and order of a single student.  Finally, the fact that plaintiff did not receive an interview serves only to reinforce defendant's view that plaintiff was not as qualified as other candidates, including Lanzenstiel; it does not indicate retaliation.

Because plaintiff has not demonstrated that defendant's proffered legitimate reasons for not selecting plaintiff for the Special Education Teaching Assistant position at the Freshman Center in August of 2011 were a pretext for retaliation, summary judgment is due to be granted with regard to that position.

### iv.   Custodian position at the Freshman Center in January of 2012

43

Defendant again asserts that plaintiff cannot establish a *prima facie* case of retaliation with regard to this position because he cannot demonstrate a causal connection between any protected activity and his failure to receive the position. With regard to plaintiff's FMLA retaliation claim, this court agrees, because the decision not to hire plaintiff for this position was made a year and nine months after plaintiff returned to work from FMLA leave. That is far too great of a temporal gap to support a causal connection. With regard to the retaliation claim under Title VII and 42 U.S.C. § 1981, the temporal proximity between even plaintiff's amended EEOC charge (filed in May of 2011) and the employment decision (in January of 2012) would be too great to support a causal connection. Even so, a reasonable jury could conclude that the temporal gap between plaintiff's protected activity of filing the complaint in this case in December of 2011 and the employment decision in January of 2012 is sufficiently close to support a causal connection.

Once again, however, defendant has offered a legitimate, non-retaliatory reason for choosing Joey Franklin for this position instead of plaintiff; that is, Franklin had a very good interview and had performed some custodial duties while he was the pastor of a small church.

Plaintiff argues that defendant's proffered reason really is a mere pretext for retaliation. Specifically, he states:

> [G]iven that the that [sic] Cobb was not even allowed to interview for the
> position, that part of Cobb's duties as Security Officer involved custodial
> duties, the comments Sheppard had made about Cobb's leave for his
> knee surgery and recovery, that Womack had discussed the allegations
> of the EEOC charge with Sheppard, that Cobb had filed suit making
> allegations under the FMLA and the other statutes in December of 2011,
> that Franklin had not filed an EEOC charge, was not disabled and had
> not utilized FMLA leave, a jury could conclude that Defendant's
> articulated reason for its actions was pretextual for retaliation and
> disability discrimination.[86]

Most of these arguments are the same ones plaintiff has asserted with regard to the

other positions, and they are unpersuasive for the reasons already stated.  Plaintiff's

assertion that he had performed some custodial duties as a Security Officer also is not

persuasive.  Neither plaintiff nor Franklin had ever served as a full-time custodian, but

both had performed some cleaning duties as part of previous positions.   Even

assuming plaintiff's responsibility for cleaning the cafeteria while he was a Security

Officer was equal to Franklin's custodial duties as a pastor, that would render the two

candidates more or less equally qualified.  It cannot be said that the difference in the

two men's qualifications was so great that no reasonable person would have chosen

Franklin over plaintiff for the position.

    Because plaintiff has not demonstrated that defendant's proffered legitimate

reasons for not selecting plaintiff for the Custodian position at the Freshman Center

in January of 2012 were a mere pretext for retaliation, summary judgment is due to

---

[86] Doc. no. 30, at 28 (alterations supplied).

be granted with regard to that position.

###### v.   Custodian positions at the Freshman Center in May of 2012

Plaintiff cannot establish a *prima facie* case of retaliation with regard to either of the Custodian positions at the Freshman Center in May of 2012 because he cannot demonstrate a causal connection between any protected activity and the decisions not to hire him for those positions.   The temporal proximity between any protected activity — regardless of whether it be plaintiff's FMLA leave, EEOC charge, or the complaint filed in this case — and the employment decisions is too great, and there is no additional evidence to support a causal connection.

Even if plaintiff could establish a *prima facie* case with regard to these two positions, defendant has offered a legitimate, non-retaliatory reason for not selecting plaintiff.   Defendant states that it selected Howard Brummett for one of the positions because Mr. Brummett had previous experience as a custodian in Indiana, and he had also served as a substitute custodian at the Freshman Center.   Defendant selected Ceretha Perkins for the other position because she had experience as a housekeeper and as a substitute custodian at the Freshman Center.   Additionally, many teachers thought Perkins did such a good job as a substitute custodian that they lobbied for her to receive the permanent position.   Plaintiff, in contrast, had never had a full-time job as a custodian, although he had performed some cleaning duties as part of his previous

46

jobs.

Plaintiff argues that these proffered reasons are actually a mere pretext for retaliation.  Specifically, he states:

> [G]iven that the that [sic] Cobb was not even allowed to interview for the positions, that part of Cobb's duties as Security Officer involved custodial duties, the comments Sheppard had made about Cobb's leave for his knee surgery and recovery, that Womack had discussed the allegations of the EEOC charge with Sheppard some time between December 17, 2010 and January 18, 2011, and that neither Brummett or Perkins had filed an EEOC charge, had a disability or had utilized FMLA leave, a jury could conclude that Defendant's articulated reason for its actions was pretextual for retaliation and disability discrimination.[87]

These are the same arguments plaintiff has raised with regard to the other positions, and for the same reasons previously stated, the court is not persuaded by them.

Because plaintiff cannot establish a *prima facie* case of retaliation, and because he has not demonstrated that defendant's proffered legitimate reasons for not selecting plaintiff for the Custodian positions at the Freshman Center in May of 2012 were a mere pretext for retaliation, summary judgment is due to be granted with regard to those positions.

### c.    Conclusion

Because plaintiff either cannot establish a *prima facie* case of retaliation, or cannot demonstrate that defendant's proffered legitimate, non-retaliatory reasons are

---

[87] *Id.* at 30 (alterations supplied).

actually a mere pretext for retaliation, summary judgment is due to be granted on all of plaintiff's retaliation claims pursuant to the FMLA, Title VII, and 42 U.S.C. § 1981.  Furthermore, because defendant is entitled to summary judgment on the merits on all of plaintiff's retaliation claims, the court need not consider plaintiff's alternative argument that plaintiff failed to exhaust his administrative remedies.[88]

## IV. CONCLUSION

In accordance with the foregoing, the court finds there are no genuine issues of material fact, and defendant is entitled to judgment as a matter of law on all of plaintiff's claims.   Accordingly, defendant's motion for summary judgment is GRANTED, and all claims are DISMISSED with prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE and ORDERED this 18th day of September, 2013.

_____
United States District Judge

---

[88] The exhaustion of administrative remedies argument would, in any event, only have applied to plaintiff's Title VII retaliation claim.  There is no administrative exhaustion requirement under 42 U.S.C. § 1981 or the FMLA.  *See, e.g., Mathis v. Leggett & Platt,* 263 F. App'x 9, 12 (11th Cir. 2008) (§ 1981); *Shanks v. Potter*, No. CV 110–045*,* 2010 WL 8347107, *5 n.4 (S.D. Ga. Dec. 28, 2010) (FMLA).